**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SIERRA CLUB,

               Plaintiff,

vs.                                           Case No. 3:05-cv-362-J-32TEM

UNITED STATES ARMY CORPS OF
ENGINEERS, et al.,

               Defendants.

_____

NATURAL RESOURCES DEFENSE COUNCIL,

               Plaintiff,

vs.                                           Case No. 3:05-cv-459-J-32TEM

UNITED STATES ARMY CORPS OF
ENGINEERS, et al.,

               Defendants.

_____

## ORDER GRANTING PRELIMINARY INJUNCTION

These cases[1] are before the Court on plaintiffs' motions for preliminary injunction.

(Sierra Club's motion is Doc. 46 in Sierra Club, 05-362 and Natural Resources Defense

Council ("Natural Resources")'s motion is Doc. 26 in Natural Resources, 05-459).

Responses, replies, pertinent parts of the administrative record and other evidentiary

_____

[1]On August 19, 2005, the Court consolidated these two cases (see Order, Doc. 44 in
Sierra Club case (3:05-cv-362-J-32TEM, "05-362") and Doc. 42 in Natural Resources
Defense Council case (3:05-cv-459-J-32TEM, "05-459")) and virtually all filings following that
date have been filed in the Sierra Club case only.  Although some of the papers related to
these motions were filed before that date, all documents referenced in this Order are located
in the Sierra Club case unless otherwise noted.

materials have been filed by all parties.  See Docs. 46, 47, 48, 51, 52, 55, 57, 58, 59 in

Sierra Club, 05-362 and Docs. 28, 30, 31, 32, 33, 34, 35, 36 in Natural Resources, 05-459.[2]

The Court heard oral argument on the motions on October 6, 2005, the transcript of which

(Doc. 67) is incorporated by reference.

Although, as stated at the October 6, 2005 hearing, pursuant to Fed. R. Civ. P. Rule

65(a)(2), the Court intended to consolidate its consideration of the preliminary injunction

motions with a final order on the merits, plaintiffs have now filed papers alerting the Court

to developments in the case which bring renewed urgency to the motions (Doc. 63).[3]

---

[2]Defendants have moved to exclude evidence submitted by plaintiffs which is outside the administrative record.  See Doc. 54 (motion); Doc. 60 (plaintiffs' response).  Because this case is before the Court on motions for preliminary injunction (where, for example, proof of irreparable harm is an issue separate from the merits), the parties are not confined to arguing from the administrative record for all purposes (as even defendants admit, see Doc. 54 at 5 n.1, 7 n.2), and defendants' motion is therefore denied for purposes of these motions. See, e.g., Pollgreen v. Morris, 770 F.2d 1536, 1545 (11th Cir. 1985).  Although the Court will reconsider this ruling in the context of issuing its final order, given the types of challenges plaintiffs raise to the issuance of the permit (particularly the technical/scientific grounds), this case might permit consideration of the types of materials submitted by plaintiffs.  See, e.g., Sierra Club v. U.S. Army Corps of Engineers, 935 F.Supp. 1556, 1567 (S.D. Ala. 1996) (discussing Eleventh Circuit standard for consideration of extra-record material in APA review action); Manatee County v. Gorsuch, 554 F.Supp. 778, 782-83 (M.D. Fla. 1982). Moreover, it is not entirely clear that even defendants believe plaintiffs are strictly confined to the administrative record, having argued that plaintiffs bear the burden of submitting "detailed and conclusive evidence" in support of some of their arguments.  See Doc. 52 (defendants' memorandum of law) at 40.

[3]While defendants and the intervenor insist that the new developments (such as the very recent authorization of the WaterSound North project which defendants and the intervenor failed to disclose at the October 6 hearing) should not alter the Court's decision to consolidate its consideration of the preliminary injunction motion with a ruling on the merits of the case (see Docs. 68, 69), the Court disagrees.  Plaintiffs, who filed the motions for preliminary injunction, have represented that the anticipation of these new developments in the case were the very reason they filed the motions and, consistent with usual preliminary injunction practice, they are entitled to a prompt ruling.

Therefore, while the Court will continue its work toward rendering a final order addressing all issues in this case, at this time the Court will rule on the more narrow question of whether plaintiffs have shown entitlement to preliminary injunctive relief. The parties are reminded that this decision is only a preliminary ruling and is subject to reversal or revision in a final order.

## I. Background

On June 30, 2004, defendant United States Army Corps of Engineers issued SAJ-86, a regional general permit, which contemplates development of 48,150 acres in Northwest Florida in the Lake Powell, Choctawhatchee Bay and West Bay watersheds along the U.S. Highway 98 corridor, an area which has been used since the 1920s for the intense production of pine trees.[4] Intervenor St. Joe Company owns more than 75% of the acreage covered by the regional general permit. SAJ-86 allows the discharge of dredged and fill materials into wetlands to support the construction of thousands of homes and other residential, commercial, recreational and institutional projects. SAJ-86 contemplates that development will only be allowed on 30% of the area covered by the permit. No more than 20% of the wetlands in any one of 19 different geographic sub-basins may be destroyed and no more than 1500[5] total acres of wetlands may be destroyed within the entire 48,150 acre parcel. SAJ-86 also includes detailed plans to mitigate for lost wetlands by preservation,

---

[4]A copy of the permit is of record at Doc. 52, Exhibit 6 (pages 3876-3891 of the Administrative Record ("AR")).

[5]There is some debate in the parties' papers as to whether this number may actually be higher than 2000 acres.

restoration and enhancement of other wetlands both within and outside the permit area. By statute, this regional general permit, SAJ-86, expires in five years and may be revoked or modified. 33 U.S.C. § 1344(e)(2).[6]

Under SAJ-86, developers and others seeking to build within the permit area apply to the Corps' District Engineer who may authorize individual projects upon finding them to be compliant with the terms of SAJ-86. Without the issuance of this regional general permit, those seeking to build in the permit area would have to apply to the Corps for an "individual permit," which process includes opportunity for public review and input regarding the specific details of each individual development project, a feature which is not a component of individual project authorization under SAJ-86. Notwithstanding the existence of SAJ-86, however, a party may still apply for an individual permit to dredge and fill within the regional permit area.

_____

[6]The Corps regulations state that a nationwide general permit may be renewed or reissued following public notice and opportunity for hearing. 33 C.F.R. § 330.5(b)(2). The Court found no similar regulation governing renewal or reissuance of regional general permits and the Corps' definition of these permits, 33 C.F.R. § 325.2(e)(2), states "[n]o regional permit shall be issued for a period of more than five years." At oral argument, counsel for the Corps stated that if there were efforts to reissue SAJ-86 upon its expiration, "[t]he process would start all over again . . . [with] public notice, comment period, response to comments, and then the renewed permit." Doc. 67, Tr. 149. Special Condition 24 of SAJ-86 states as follows: "The Permit will be valid for 5 years from the date of issuance unless suspended or revoked by issuance of a public notice by the District Engineer. The Corps, in conjunction with the Federal resource agencies will conduct periodic reviews, which will include compliance reviews, to determine if continuation of the permit is not contrary to the public interest. The permit can be reissued for 5-year periods indefinitely, if it is found not to be contrary to the public interest." Doc. 52, Exhibit 6 at 11-12. Thus, the terms of reissuance as stated in the permit do not necessarily reflect that the process would include public input or hearing; rather, the language of the permit appears to allow reissuance upon a finding by the Corps made in conjunction with Federal resource agencies. The Court may seek clarification of this issue from the parties.

In April and May of 2005 the plaintiffs filed complaints against the Corps and two Corps officials[7] challenging the Corps' authority to issue the SAJ-86 permit on grounds that it violates the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.* ("CWA"), and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"). Although the Corps had apparently issued authorizations for at least two "smaller" projects since the June 30, 2004 issuance of SAJ-86, plaintiffs waited until early August 2005 before moving for preliminary injunctive relief.[8] During a telephone hearing on August 19, 2005, the Court discussed with the parties the possibility of consolidating the motions with a decision on the merits, addressed other pending motions in the case, and set a schedule for record production, briefing and oral argument on the motions for preliminary injunction. See Order, Doc. 44.

The Court proceeded with the hearing on October 6, 2005 advising the parties on the record (without objection) of its intention to consolidate the proceedings with a final decision on the merits pursuant to Fed.R.Civ.P. Rule 65(a)(2). However, as noted above, upon notification of the Corps' authorization under SAJ-86 of the WaterSound North development,

_____

[7]The Corps and the two Corps officials (Lieutenant General Carl A. Strock, Commander and Chief of Engineers, and Colonel Robert M. Carpenter, District Engineer of the Jacksonville District), filed joint briefs; references to the position of "the Corps" are references to the position taken by all three defendants.

[8]Plaintiffs explained at the hearing that earlier state court litigation had prevented the Corps from authorizing projects for some period following the issuance of SAJ-86 and the plaintiffs therefore did not have a need to file their lawsuits or to move for preliminary injunctive relief earlier than they did. Two Corps SAJ-86 authorization letters dated May 24, 2005 and July 14, 2005 are of record, authorizing the fill of 12 total acres of wetlands between the two projects. Doc. 47, Exhibits 4 & 5. Plaintiffs' October 25, 2005 reply brief (attachment to Doc. 70, Motion for leave to file reply), which the Court will permit to be filed over defendants' objection (Doc. 71), states that two additional projects have been authorized which allow the destruction of an additional 13.6 acres.

plaintiffs promptly renewed their request for expedited consideration of their preliminary injunction motions, seeking to prevent issuance of any new project authorizations under the SAJ-86 permit and to enjoin any construction that may already be occurring or that is about to occur in reliance on this permit.  It is on this record that the following decision issues.

## II. Standard of Review

To secure a preliminary injunction, a party must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to each of the four prerequisites." Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (citation and quotation omitted).  Pursuant to Fed.R.Civ.P. Rule 65(c), once the Court determines a preliminary injunction should issue, it must also address the matter of bond.

## III.  Discussion

### A.      Likelihood of success

In assessing plaintiffs' likelihood of success, the Court must review the Corps' decision to issue SAJ-86, which, as a decision of an administrative agency, is subject to review under the Administrative Procedure Act ("APA") and must be upheld unless plaintiffs can demonstrate that the decision was "arbitrary, capricious, an abuse of discretion or

otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  See Wilderness Watch and Public Employees for Environmental Responsibility v. Mainella, 375 F.3d 1085, 1088 (11th Cir. 2004).

An agency action is arbitrary and capricious within the meaning of the APA where the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

However, in addressing whether an agency has acted in accordance with law in interpreting a statute it is charged with administering, the Court must use the two-step analysis described in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  "Under Chevron, [the court] first ask[s] whether congressional intent is clear, and if so, 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  Wilderness Watch, 375 F.3d at 1091 (quoting Chevron, 467 U.S. at 842-43).  Congressional intent is examined through use of traditional tools of statutory construction.  Id.; Chevron, 467 U.S. at 843 n.9.  If the statute is silent or ambiguous, the court then defers to the agency interpretation if it appears that "Congress delegated authority to the agency generally to make rules carrying the force of law, and the agency interpretation claiming deference was promulgated in the exercise of that authority."  Wilderness Watch, 375 F.3d at 1091 (quoting U.S. v. Mead Corp., 533 U.S. 218, 226-27 (2001)).

7

Plaintiffs claim that issuance of SAJ-86 was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law because it violates several provisions of both the CWA and NEPA as well as Corps regulations and guidelines for enforcement of these Acts.  To secure a preliminary injunction, plaintiffs must demonstrate a substantial likelihood of showing that the Corps' issuance of SAJ-86 violated any one of the relevant provisions of either Act or the attendant regulations, as alleged in their complaints.[9]  While

_____

[9]Citing Department of Transportation v. Public Citizen, 541 U.S. 752 (2004), the Corps argues that plaintiffs have waived many of the challenges alleged in their complaints by failing to raise them during the SAJ-86 public input period. The Corps was unable, however, to articulate which specific CWA challenges it believed had been waived.  In any event, the plaintiffs, their members, or other members of the public sufficiently raised all of the complaints' allegations regarding CWA non-compliance during the public input period. See Doc. 52, Exhibit 3.  Thus, unlike in Public Citizen, the Corps had an opportunity to address the alleged CWA violations before issuing SAJ-86 (regardless of which entity brought the alleged violations to the Corps' attention).  See, e.g., Appalachian Power Co. v. E.P.A., 135 F.3d 791, 818 (D.C. Cir. 1998); Toy Mfrs. of Am., Inc. v. Consumer Prods. Safety Comm'n, 630 F.2d 70, 73 n.5 (2nd Cir. 1980).  Moreover, as conceded on the record at the October 6, 2005 hearing, the Corps' NEPA findings were not yet completed when the public comment period ended; plaintiffs therefore had no opportunity to bring certain of their specific challenges to the Corps' attention (though several NEPA issues were raised by plaintiffs and others during the public comment period).  The Court therefore rejects the Corps' argument that any of the challenges raised by plaintiffs' complaints have been waived.  The Corps additionally claims plaintiffs raised new arguments that are beyond the scope of their complaints, including specifically, challenges to the Corps' reliance on mitigation. However, plaintiffs' arguments regarding the Corps' mitigation methodology were in response to the Corps' position that it is permitted to consider mitigation when determining whether an activity will have minimal adverse environmental impacts as required for issuance of a general permit.  Thus, plaintiffs' position that mitigation cannot be considered is an extension of the allegations, contained in their complaints and raised during the public input process, that the issuance of SAJ-86 is unlawful because the authorized activities will have more than minimal adverse environmental impacts and/or that the impacts cannot be adequately assessed because specific information about individual development plans was not available when the Corps issued SAJ-86.  See 05-459, Doc. 1 (Complaint) at ¶¶54, 55; 05-362, Doc. 1 (Complaint) at ¶ 26(a).  Plaintiffs have not raised any arguments that are beyond the scope of their complaints and all of the challenges raised in their complaints are preserved.

the Court will address the parties' other contentions in its Final Order, for the reasons discussed below, the Court finds plaintiffs have demonstrated a substantial likelihood of showing that the issuance of SAJ-86 fails to comply with the statutory requirements for issuance of a general permit under the CWA[10]; therefore, plaintiffs have also demonstrated a substantial likelihood of showing that the Corps' decision to issue the permit was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### 1.    CWA General Permitting Scheme

Congress enacted the CWA "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Under the CWA statutory scheme, a party must secure an individual permit (a section 404(a) permit) from the Corps before discharging dredged or fill material into navigable waters unless the discharge of dredged or fill material is already authorized under the terms of a general permit.  33 U.S.C. § 1344.  Section 404(e) of the CWA (33 U.S.C. § 1344(e)) authorizes the Corps to issue a general permit "for any category of activities involving discharges of dredged or fill material" where "the activities [covered by the general permit] are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effects on the environment." 33 U.S.C. § 1344(e)(1).  General

---

[10]Intervenor St. Joe has moved to dismiss this count in both cases (count one in Natural Resources, count two in Sierra Club), claiming plaintiffs failed to give proper pre-suit notice as required by statute, thereby depriving the Court of subject matter jurisdiction.  The Court finds plaintiffs have properly brought suit under the APA pursuant to 5 U.S.C. § 704. See Hill v. Boy, 144 F.3d 1446, 1449 (11th Cir. 1998); Deltona Corp. v. Alexander, 504 F.Supp. 1280, 1284 (M.D. Fla. 1981).  St. Joe's motion is denied.

permits may be issued on a regional, statewide or nationwide basis.  Id.

Unlike individual permits, which cover a single project and which are each vetted through a public input process, general permits, like SAJ-86, render *specific* project review and public input unnecessary, although the public has opportunity for input into the Corps' decision whether to issue a general permit.  Once a general permit has issued, the Corps, acting under a more relaxed review process, issues authorizations for proposed individual projects within the general permit area that comply with the general permit terms.[11]  Notably, neither plaintiff alleges that any irregularities occurred with the *process* of SAJ-86's issuance (meaning plaintiffs are not challenging whether required findings were made or whether notice was given or whether hearings were held).  Rather, as discussed below, plaintiffs claim the terms of SAJ-86 do not comply with the requirements for issuance of a general permit under 33 U.S.C. § 1344(e) and that the Corps has therefore acted outside its lawful authority in issuing SAJ-86.[12]

As stated, Congress has directed that the Corps may "issue general permits . . . for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category:

---

[11]The terms of SAJ-86 provide that the Corps will involve other federal and state agencies (but not the public) in the pre-authorization evaluation process.  See Doc. 52, Exhibit 6 at Special Condition 20 (AR 3884-86).  With some general permits, additional authorization by the Corps is not required at all.  See, e.g., Doc. 47, Exhibit 9 (summary chart of 2002 Nationwide Permits) (showing that many nationwide general permits do not require any pre-construction notification at all).

[12]The Court's Final Order will address plaintiffs' many other challenges regarding the Corps' compliance with other aspects of the CWA and related Corps regulations, as well as their NEPA arguments.

[(1)]   are similar in nature,

[(2)]   will cause only minimal adverse environmental effects when performed

separately, and

[(3)]   will have only minimal cumulative adverse effect on the environment."

33 U.S.C. § 1344(e).

### a.      Similar in Nature

The CWA authorizes the Corps to issue a general permit for any category of activities

which are "similar in nature."  33 U.S.C. § 1344(e).  SAJ-86 "applies to the discharges of

dredged or fill material into non-tidal waters of the United States for[:]

> the construction of residential, commercial, recreational and institutional
> projects, including building foundations, building pads and attendant features
> that are necessary for the use and maintenance of the structures.  Attendant
> features may include, but are not limited to, roads, parking lots, garages,
> yards, utility lines, and stormwater management facilities.   Residential
> developments include multiple and single unit developments.  Examples of
> commercial developments include retail stores, light industrial facilities,
> restaurants, business parks, and shopping centers. Examples of recreational
> facilities include playgrounds, playing fields, golf courses, hiking trails, bike
> paths, horse paths, stables, nature centers, and campgrounds.  Examples of
> institutional developments include schools, fire stations, government office
> buildings, judicial buildings, public works buildings, libraries, hospitals and
> places of worship."

Doc. 52, Exhibit 6, Special Condition 3 (AR 3876-77).  Although the permit itself does not

describe how these activities are similar in nature, in response to a public comment which

challenged the proposed permit on the ground that it failed to conform with this CWA

statutory requirement, the Corps stated that these activities are "similar in nature" because

they are all components of "suburban development."  <u>See</u> Doc. 52, Exhibit 4, Statement of

Finding, at 56 (AR 3856).

The phrase "similar in nature" is not further defined in the statute.  Neither the parties nor the Court's own limited review has unveiled any legislative history bearing on the meaning of this term.  However, we know from the plain language that Congress has intended that the activities authorized by a general permit be "similar."  See Chevron, 467 U.S. at 843, n.9 (stating that court has no occasion to consider agency interpretation of statute if traditional tools of statutory construction reveal congressional intent); Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (court's "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case"); Wilderness Watch, 375 F.3d at 1093 n.9 ("Common sense is the most fundamental guide to statutory construction.") (citation omitted).

Few reported cases discuss the meaning of "similar in nature."  One is Alaska Center for the Environment v. West, 157 F.3d 680 (9th Cir. 1998), in which five general permits were challenged, one that applied to residential buildings under 50 feet high; one to residential streets no more than 75 feet wide; one to public and private institutions and businesses authorized by a municipal code, excluding underground storage tanks and prohibiting particular pollutants; one to industrial developments for the production of inert materials, with a variety of restrictions; and one to particular environmental enhancement projects. 157 F.3d at 681, 683.  In determining whether the ranges of activities authorized under each permit were similar in nature, the court addressed issues such as whether the residential building general permit was overly broad in failing to distinguish between single and two-family dwellings.  Id. at 684.  The court found the answer to particular questions such as those was not found in the statute and the court therefore turned to the Corps' construction, according

it the deference to which it was entitled under <u>Chevron</u> to find that "the general permitting process did not require such fine distinctions." <u>Id.</u>

In contrast to the specific and circumscribed general permits in <u>Alaska Center</u>, here, the Court is not looking to find meaning between such "fine distinctions"- - rather, in this case, the Court looks to the statute to see if it provides an answer to congressional intent on the question of whether the rather expansive list of activities authorized by SAJ-86 are "similar in nature." <u>See</u> <u>Robinson</u>, 519 U.S. at 340 (court reviews statutory language "<u>with regard to the particular dispute in the case</u>") (emphasis added).[13]

In SAJ-86, the Corps has authorized the discharge of dredged or fill material to support the construction of activities ranging from horse stables to public works buildings, from light industrial facilities to multiple unit residential developments, from restaurants to roads, and from hospitals to utility lines, all under the rubric of "suburban development." Moreover, as noted above, SAJ-86 states that activities such as these are just <u>examples</u> of what might be authorized under the broad categories of "construction of residential, commercial, recreational and institutional projects." At argument, the Corps was unable to

_____

[13]Indeed, the general permits at issue in <u>Alaska Center</u> each applied to a rather specific single category of activity, as do most of the general permits reviewed by the Court. <u>See, e.g.</u>, Doc. 47, Exhibit 9 (summary chart of 2002 Nationwide Permits) (listing categories of activities covered by each permit such as "aids to navigation;" "structures in artificial canals;" "scientific measurement devices;" "survey activities;" "mooring buoys;" "bank stabilization;" "U.S. Coast Guard approved bridges;" "hydropower projects;" "cranberry production activities"); Doc. 47, Exhibit 10 (August 19, 2005 listing of currently issued general permits administered by the Corps' Jacksonville District) (listing categories of activities covered by each permit such as "maintaining dredging of residential canals in Florida;" "private single-family boat ramps in Florida;" "aerial transmission lines in Florida;" "subaqueous utility and transmission lines in Florida;" "minor structures in Florida;" "private single-family boat slips in upland cuts of Florida").

articulate an activity that might not be authorized under this permit other than heavy industrial facilities, though even this activity might arguably fall within the definition of commercial development and is therefore not necessarily outside the bounds of the permit.

Therefore, <u>Alaska Center</u> stands in contrast to this case. Here, on its face, the panoply of development activities authorized by SAJ-86 can only be defined as "similar in nature" if that phrase is robbed of all its meaning, a result inconsistent with Congress' decision to limit the scope of general permits. <u>See</u>, <u>Ohio Valley Environmental Coalition v. Bulen</u>, 2004 WL 1576726, *15 (S.D. W.Va. July 8, 2004) (describing legislative history and purpose in creating general permitting scheme as being to alleviate burden placed on Corps by authorizing issuance of general permits for discrete categories of activities having minimal adverse effects on the environment). <u>See also</u>, <u>Wilderness Watch</u>, 375 F.3d at 1092-93 (finding plain language of statute contradicted National Park Service argument that 15-passenger van was "necessary" where statute barred motor vehicles "except as necessary," stating "[i]n no ordinary sense of the word can the transportation of fifteen people through wilderness area be 'necessary' to administer the area for the purpose of the Wilderness Act" and further finding that "overall purpose and structure of the statute argue[d] against the agency interpretation").[14]

_____

[14]Consistent with <u>Chevron</u>, because the Court preliminarily finds no ambiguity in congressional intent regarding the requirement that activities be similar in nature (at least as applied to SAJ-86), the Court has no occasion in this Order to consider the Corps' position at argument that SAJ-86 is lawful because Corps regulations allow issuance of a general permit for categories of activities which cause only minimal individual and cumulative environmental impacts provided the activities are "substantially similar in nature" *or* when the permit issuance would result in "avoiding unnecessary duplication of regulatory control" between agencies. <u>See</u> 33 C.F.R. § 323.2(h). Moreover, even if the Court were to consider

Even the Corps' lone effort to describe the "similarity" of the allowable activity under SAJ-86, that is, that it all relates to "suburban development," is belied by the fact that every activity listed in the permit could also be a feature of, for example, "urban development" or, for that matter, "development." This is even assuming that a broad catch-all description such as "suburban development" is sufficient to meet the "similarity in nature" parameters under the CWA, a proposition as to which the Court is in serious doubt. Cf., Wyoming Outdoor Council v. U.S. Army Corps of Engineers, 351 F.Supp.2d 1232, 1257-58 (D. Wyo. 2005) (citing Alaska Center and finding Corps complied with CWA by issuing one general permit for surveys, roads, well pads, utilities, reservoirs, erosion control, hazardous waste cleanup, and mitigation to support oil and gas production in Wyoming). The Corps forthrightly says it has never before used a regional general permit in this way; preliminarily, the Court finds the plaintiffs have shown a substantial likelihood of proving that it may not do so.[15] Plaintiffs have therefore demonstrated a substantial likelihood that the Corps has issued a general permit that fails to comply with the CWA requirement that a general permit issue only for

_____

that regulation, it is hard to see how it helps the Corps' position. See Chevron, 467 U.S. at 843-44 (where Congress has left gap for agency to fill, regulations must not be "arbitrary, capricious or manifestly contrary to statute").

[15]In the Statement of Finding which preceded the issuance of SAJ-86, the Corps stated that the category of activities authorized by this permit was modeled after the activities authorized by Nationwide Permit 39. See Doc. 52, Exhibit 4 at 56-57 (AR 3856-57). Plaintiffs have reported that Nationwide Permit 39 is back before the Corps for reconsideration following a voluntary remand from a court challenge, albeit on a ground apparently unrelated to the similarity of the nature of the authorized activities. While the bona fides of Nationwide Permit 39 are not before this Court, it does bear noting that authorized projects under that permit are limited to those which will impact no more than ½ acre. Thus, the resulting activities which may be authorized under SAJ-86 as compared to Nationwide Permit 39 may in fact turn out to be quite different.

activities which are similar in nature.[16]

###   b.   Separate and Cumulative Adverse Environmental Effects

The CWA authorizes the Corps to issue a general permit for activities which "will cause only minimal adverse effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e).  As noted above, SAJ-86 authorizes a wide range of activities.  The permit does, however, place a 20% limit on the percentage of wetlands which may be destroyed within any of the 19 sub-basins in the permit area and further limits the total area of high quality wetlands which can be destroyed to 125 acres, and only for purposes of road and bridge crossings.[17]  The permit contains a complex scheme of compensatory mitigation and conservation meant to replace some of the lost wetlands in the permit area, although the permit contemplates that at least some of the mitigation may take place outside the geographic area covered by SAJ-86.  There is no particular limit on the separate environmental effect of any single project (provided no one project exceeds the 20% limit for the total destruction of wetlands in the sub-basin in which the project is located) and any mitigation to be required for a specific project is determined during the post-permit pre-authorization stage.

---

[16]While this alone is sufficient ground to grant preliminary injunctive relief, the Court has also determined to address whether SAJ-86 meets the remaining CWA statutory requirements for issuance of a general permit.

[17]For purposes of SAJ-86, the Corps defines low quality wetlands as wetlands planted with pine trees; high quality wetlands are all other wetlands.  Doc. 52, Exhibit 6 (Regional General Permit SAJ-86 at Special Condition 4) (AR 3877).

The Corps acknowledges that "[r]egulated activities that would be authorized" under SAJ-86 "would include the placement of fill in regulated wetlands for the construction of residential, commercial, recreational and institutional projects, possibly including multiple and single unit residential developments, retail stores, light industrial facilities, restaurants, business parks, shopping centers, playgrounds, playing fields, golf courses, stables, nature centers, campgrounds, schools, fire stations, government office buildings, judicial buildings, public works buildings, libraries, hospitals, and places of worship, roads, bridges, and utility line installation" and further acknowledges that "[t]he construction and operation of these various developments . . . would have direct, indirect, and cumulative impacts on onsite wetlands and waters; but no direct and only minimal indirect impact on aquatic resources outside the [SAJ-86] project area, which include wetlands and receiving waterbodies." Doc. 52, Exhibit 4 (Statement of Finding) at 4 (AR 3804) (emphasis supplied). Thus, the Corps contemplates that the authorized activities will have environmental impacts- - the question here is whether these impacts will be separately and cumulatively minimal, as required by statute for issuance of a general permit.

In Ohio Valley, 2004 WL 1576726, environmental groups successfully challenged a nationwide permit authorizing mountain-top mining projects on the ground that the Corps' post-permit case-by-case evaluation of environmental impacts was prohibited by the statutory framework of the CWA general permitting scheme.  The district court agreed, holding that the permit "could not withstand the scrutiny of the first Chevron question" because the statute "unambiguously requires determination of minimal impact before, not after, the issuance of a nationwide permit;" therefore, "[t]he issuance of a nationwide permit

thus functions as a guarantee *ab initio* that every instance of the permitted activity will meet the minimal impact standard." Ohio Valley, 2004 WL 1576726, at *13.  In enjoining any new construction under the permit, the court found that "Congress has spoken directly to the issue here through the plain language of the Clean Water Act." Id.  In the Ohio Valley case, like this one, the Corps had acknowledged that authorized activities would have the potential to affect the environment significantly but, again like here, the Corps claimed it could "guarantee[ ] minimal effects through case-by-case analysis of [permit] projects." Id. at *14. See SAJ-86, Special Conditions 20(b) and 21 (AR 3886) (describing pre-authorization process which involves submission of plans to Corp which then provides written authorization and possible imposition by the Corps of additional special conditions on a case-by-case basis as necessary to minimize adverse environmental impacts).  In Ohio Valley, the court found the plain language of the CWA prohibits a procedure whereby the Corps conducts post-permit reviews of proposed mitigation to determine whether activities will meet the minimal effects requirement.  2004 WL 1576726, at *14.  The court further found that the legislative history of the CWA division between individual and general permits confirmed that activities are appropriate for general permitting only if the Corps can "define a category of activities that will have minimal effects, absent individual review of each activity." Id. at *15. Otherwise, "[e]ach such activity should receive the comprehensive individual review" prescribed by the individual permitting provision of the statute.  Id.  Thus, a general permitting scheme which is "predicated on post-issuance review and approval of particular projects," is "antithetical to Congress's purpose in bifurcating Section 404 into one section for individual review and one for general review." Id.

18

The Corps argues that the <u>Ohio Valley</u> decision (which is on appeal) was wrongly decided and is inapplicable in any event because, unlike the permit at issue there, SAJ-86 caps the limits of the environmental impacts to wetlands at 20% for the permitted region, thus ensuring that the effects will be minimal.  However, the CWA requires that both the cumulative and the separate environmental effects be minimal and it does not limit the consideration to wetlands impact only.  SAJ-86 allows an extremely broad range of as yet undetermined development activities.  Because the Corps has not defined with any precision the number and type of activities that may be authorized by SAJ-86, it cannot assess the separate impact of any particular activity (which impact may well differ depending on the activity) that may later be authorized under the permit.  The Court finds the analysis and reasoning of the <u>Ohio Valley</u> decision to be persuasive and finds here too that SAJ-86 violates the statutory requirement that the Corps reach "a final determination of minimal environmental impact *before*, not *after*, issuance" of a general permit.  <u>Ohio Valley</u>, 2004 WL 1576726, *17.[18]

Because the activities to be authorized by SAJ-86 and their separate and cumulative adverse environmental effects was not and could not be determined at the time the permit issued but rather are assessed during a post-permit process when a project is brought to the Corps for authorization, the Court preliminarily finds that the permitting scheme of SAJ-86

_____

[18]Because the issuance of SAJ-86 fails to meet the statutory requirements of the CWA general permitting scheme, and therefore fails to meet the first part of the "<u>Chevron</u> test," (<u>Chevron</u>, 467 U.S. at 842-43; discussed *supra* p. 7), the Court has no occasion to specifically address in this Order the Corps' additional argument that it has interpreted the statute in a manner which permits it to consider compensatory mitigation in determining whether the adverse environmental effects are minimal.

does not comply with the statutory requirements of the CWA.  Plaintiffs have therefore demonstrated a substantial likelihood that the Corps has issued a general permit that fails to comply with the statutory requirements that the permit only regulate activities which will cause minimal adverse environmental effects both separately and cumulatively.

### B.   Irreparable Harm/ Balancing of Harms/ Public Interest/ Bond

The Corps says it cannot voluntarily agree that it will not authorize projects under SAJ-86 during the pendency of this action (even if tried on an expedited schedule).  Indeed, in addition to the authorizations for a commercial retail outlet and a 300 unit residential development referenced by Sierra Club in its original moving papers, the Court learned after the hearing that on September 27, 2005 the Corps issued authorization for St. Joe's 1,453.6 acre commercial and residential development, WaterSound North.[19]  In requesting that the Court treat the matter with renewed urgency, plaintiffs state that "the principal purpose of moving for a preliminary injunction was to restrain WaterSound North, a large project that will destroy approximately 70 [sic][20] acres of wetlands, as well as have severe negative impacts on Lake Powell."  Doc. 63 at 2-3.  The Corps' position is that its conservation and compensatory mitigation plans sufficiently protect affected wetlands and that the permit's stringent stormwater treatment requirements and 100 foot and 30 foot buffer zones will

_____

[19]As noted above, n.8, plaintiffs' October 25, 2005 reply brief states that two additional projects (one for a city park road and one for a mixed use residential and commercial development) have recently been authorized as well, bringing the total number of projects authorized under SAJ-86 as of October 25, 2005 to five.

[20]The authorization letter for WaterSound North allows the fill of "approximately 57.09 acres of low quality and 3.55 acres of high quality freshwater wetlands" on the parcel, which sum is 60.64 acres of wetlands.  Doc. 63, Exhibit A at 1.

protect Lake Powell from more than minimal impacts.  <u>See</u> Permit, Doc. 52, Ex. 6 at Special

Conditions 7, 20(a)(6) (AR 3878, 3885).  Thus, the Corps contends plaintiffs cannot show

irreparable environmental harms.

Plaintiffs, however, have submitted affidavits from at least two experts who agree that

the environmental impact of WaterSound North to Lake Powell under the SAJ-86 permitting

scheme will be devastating because the proposed stormwater management system is

scientifically flawed and the setbacks are inadequate.  <u>See</u> Doc. 30 in 05-459 (affidavit of

Daniel L. Childers) and Doc. 59, parts 6 & 7 in 05-362 (supplemental affidavits of Daniel L.

Childers and Robert L. Livingston).[21]  These experts additionally claim that the Corps' plans

to mitigate damage to wetlands are inadequate for several reasons including that the impact

to wetlands cannot yet be determined given that the location, size and configuration of

specific projects is unknown and because the proposed mitigation formula is not an

appropriate methodology for this usage given that the current plan is necessarily based on

estimates regarding wetlands affected and projects proposed, thus lacking the detail

necessary for scientific acceptance.

The Corps argues that its experts have approved the mitigation plans and that the

Court should therefore accept their opinions that SAJ-86 will in fact protect the environment,

not harm it.  However, in the context of demonstrating irreparable harm (as opposed to when

reaching a result on the merits of these arguments), the Court need not adopt the opinions

_____

[21]Natural Resources supplied the Court and opposing counsel with an earlier affidavit of
Robert J. Livingston as well but it does not appear that this affidavit is of record.  Counsel
for Natural Resources is directed to file a copy of the July 14, 2005 Livingston affidavit.

of one party's set of experts over another.  Rather, the Court's task is to determine whether plaintiffs have demonstrated that irreparable harm will ensue absent issuance of a preliminary injunction.  The dredging and filling of wetlands that may occur while the Court decides the case cannot be undone and, if the end result is that the Corps should not have issued SAJ-86, irreparable harm will have occurred in the meantime.  Plaintiffs' experts' opinions regarding the likely harm to Lake Powell and the wetlands in the SAJ-86 region merely serve to confirm this obvious point.

St. Joe argues that without SAJ-86, the region will continue to deteriorate due to the deleterious effects of unregulated intense pine production on the natural environment, which apparently has been ongoing for many years. However, plaintiffs have not brought this motion to stop pine production- - rather, their motions seek to prevent the filling of wetlands related to construction authorized by SAJ-86.  Viewed from this perspective, issuance of a preliminary injunction will protect the status quo.  Because the dredging and filling of wetlands cannot be undone by money damages (especially if any of the wetlands are built on), plaintiffs have shown irreparable harm.  See Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); National Wildlife Fed. v. Marsh, 721 F.2d 767, 786 (11th Cir. 1983) (irreparable injury demonstrated where, absent injunction, wetlands would be destroyed); Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville, Fla, 896 F.2d 1283, 1285 (11th Cir. 1990) (irreparable harm shown where money damages cannot unring the bell).

The Corps has not articulated any harm that would result to it from the issuance of an injunction.  As to third parties, St. Joe claims it and others will suffer significant monetary damages and lost development opportunities.  The Corps states that "months" would be added to the development process if developers are required to seek individual permits during the pendency of the suit (certainly nothing in this Order would prevent that process from beginning now).  While St. Joe's position should not be minimized, it is only one factor in the balance of the overall public interest at stake.  Although the Corps argues that the public interest favors developing the SAJ-86 area on a regional scale rather than through a patchwork of individually permitted projects, the public also has an interest in ensuring that the Corps acts within its statutory authority and that environmental laws are properly applied. The balance of possible harms and public interest considerations weigh in plaintiffs' favor. See Amoco Prod., 480 U.S. at 545 ("[I]f environmental harm is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment.").  If the injunction has been improvidently granted, it can be lifted when the Court issues its forthcoming final opinion (which the Court will endeavor to do with dispatch).

The Corps' brief was silent on the matter of bond.  St. Joe argues for a bond in an amount to compensate it and other developers for monetary damages in an amount to be determined once the Court determines to issue an injunction.  Plaintiffs have no financial interest in the outcome, which counsels against requiring any bond.  Additionally, the life of this preliminary injunction should be relatively short given that the Court's forthcoming final order will bring this case to conclusion, at which point the injunction would be lifted or turned into a permanent injunction.  The amount of a bond is within the Court's discretion,

Fed.R.Civ.P. Rule 65(c); under these facts, the Court will not require a bond.  See BellSouth

Telecomm., Inc. v. MCIMetro Access Transmission Servs, LLC, 425 F.3d 964, 971 (11th Cir.

2005) ("the amount of security required by [Rule 65(c)] is a matter within the discretion of the

trial court . . .[, and] the court may elect to require no security at all") (citations and quotations

omitted).

## IV.  Conclusion

Both the Corps and St. Joe espouse their good faith in utilizing a regional general

permit to bring a cohesive environmental approach to the inevitable development of a large

tract in Northwest Florida, rather than a less effective piecemeal approach under the

individual permitting process.  However, it is not the Court's function to determine the public

policy wisdom of this endeavor, only to decide whether it meets the requirements of existing

law.  Preliminarily, I conclude it does not.

Accordingly, it is hereby

**ORDERED**:

1.      Sierra Club's Motion for Preliminary Injunction (Doc. 46 in 3:05-cv-362-J-

32TEM) and Natural Resources Defense Council's Motion for Preliminary Injunction (Doc.

26 in Case No. 3:05-cv-459-J-32TEM) are **GRANTED** as follows:  The United States Army

Corps of Engineers, Lieutenant General Carl A. Strock, and Colonel Robert M. Carpenter,

Jacksonville District Engineer, are hereby preliminarily **ENJOINED** from issuing any new

authorizations under "Department of Army Regional General Permit SAJ-86 Residential,

Commercial, Recreational, and Institutional Fill in the Choctawhatchee Bay, Lake Powell,

and West Bay Basins Bay and Walton Counties, Florida," until further Order of the Court.

24

Moreover, defendants United States Army Corps of Engineers, Lieutenant General Carl A. Strock, and Colonel Robert M. Carpenter, Jacksonville District Engineer, and intervenor St. Joe Company, Inc., are hereby **ENJOINED** from proceeding further under the Corps' authorization of the WaterSound North development project (defined in the Corps authorization letter dated October 5, 2005[22]) until further Order of the Court.  Although plaintiffs sought to enjoin all other previously issued authorizations pursuant to SAJ-86, the Court declines to do so at this time, finding that plaintiffs have tendered insufficient evidence regarding the current state of those projects (which information would be used by the Court in balancing the harms and in determining whether the feared risks to the environment have perhaps already occurred).[23]  Nothing in this Order prohibits any party from seeking an individual permit for any specific project within the affected area under Section 404(a) of the CWA.[24]

2.     The Court has not considered and expresses no opinion concerning the other issues raised by the parties in this lawsuit.

_____

[22]The Corps has explained that the authorization letter actually issued on September 27, 2005.  See Doc. 69 at 3, n.1

[23]See, e.g., Ohio Valley, 2004 WL 157626, * 17-18 (enjoining only those projects upon which construction had not already begun).  See also, Alabama v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1133 (11th Cir. 2005) ("injunction is limited to prospective relief").

[24]Additionally, as stated in the body of this Order, Doc. 25 in 05-362 and Doc. 23 in 05-459 (motions to dismiss) are **DENIED**; Doc. 54 in 05-362 (motion to exclude evidence) is **DENIED without prejudice to renewal**; Doc. 70 in 05-362 (motion for leave to file reply) is **GRANTED**; plaintiffs' reply, which is attached as an exhibit to Doc. 70, is now considered to be of record.

3.      To allow the parties to achieve a prompt final resolution of this case, the Court will proceed as follows.  All parties have advised the Court that the case is fully briefed and ready for a final decision.  However, in light of the issues raised at oral argument and with the benefit of the Court's preliminary views as expressed in this Order, the Court will give each party an opportunity to submit a supplemental brief and will schedule another oral argument so that the Court can be fully advised before rendering a final decision in this complex and largely unprecedented case.  Additionally, the parties will now be directed to attempt to mediate this case.  Therefore, no later than **December 1, 2005**, the parties shall file a notice stating the date by which they wish to mediate and the name of the mediator they wish to use.[25]  The Court will then issue an Order of Referral to Mediation.  Additionally, no later than **December 20, 2005**, defendants and the intervenor may each file a supplemental brief of no more than 20 pages (or one joint brief of no more than 40 pages).  Plaintiffs may each file responsive supplemental briefs of no more than 20 pages (or one combined 40 page brief) no later than **January 20, 2006**.  The Court will hear final oral argument on **February 16, 2006 at 2:00 p.m.** in Courtroom 10B, United States Courthouse, 300 North Hogan Street, Jacksonville, Florida.[26]

---

[25]A list of certified mediators is available from the Clerk's Office or on the Court's website, www.flmd.uscourts.gov.  If the parties are unable to mutually agree to a mediator, the Court will select one for them.

[26]If this schedule proves too ambitious or the parties' settlement efforts so dictate, request can be made to modify this schedule.

**DONE AND ORDERED** at Jacksonville, Florida this 10th day of November, 2005.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:
counsel of record